# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| MATTHEW A. GOLDSTEIN, PLLC, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 15-0311 (RC) |
| | : | | |
| v. | : | Re Document No.: | 25 |
| | : | | |
| U.S. DEPARTMENT OF STATE, *et al.*, | : | | |
| | : | | |
| Defendants. | : | | |

## MEMORANDUM OPINION

### GRANTING DEFENDANTS' MOTION TO DISMISS

## I.  INTRODUCTION

The Arms Export Control Act ("AECA" or "the Act") authorizes the President "to control the import and export of defense articles and defense services."  22 U.S.C. § 2778(a)(1). The Act provides that "every person (other than an officer or employee of the United States Government acting in an official capacity) who engages in the business of brokering activities with respect to the manufacture, export, import, or transfer" of a defense article or service must both register with the government and seek a license before engaging in such brokering activities.  *Id.* § 2778(b)(1)(A)(ii)(I)–(III).  In 2013, the United States Department of State ("State"), by regulation, clarified its definition of "brokering activities."  *See generally* Amendment to the International Traffic in Arms Regulations: Registration and Licensing of Brokers, Brokering Activities, and Related Provisions, 78 Fed. Reg. 52,680 (Aug. 26, 2013).  As pertinent to this case, State amended the regulation to define "brokering activities" as excluding "activities by an attorney that do not extend beyond the provision of legal advice to clients."  22 C.F.R. § 129.2(b)(2)(iv); *see also* Amendment to the International Traffic in Arms Regulations:

Registration and Licensing of Brokers, Brokering Activities, and Related Provisions, 76 Fed. Reg. 78,578, 78,578 (Dec. 19, 2011) (proposed rule explaining the change).

This case arises out of a dispute over whether and, if so, in what circumstances an attorney acting on behalf of his client may nevertheless be engaging in "brokering activities." After receiving advisory guidance from State about the provision's scope that he found insufficient, Matthew A. Goldstein initiated this action on behalf of his eponymous law firm, Plaintiff Matthew A. Goldstein PLLC. Plaintiff's complaint seeks a declaration equitably estopping State from applying the regulations to its legal services and declaring that State's definition of "brokering activities" is *ultra vires*, unconstitutional, and violates the Administrative Procedure Act ("APA"). Plaintiff also seeks an injunction permanently enjoining State from applying the brokering regulations to Plaintiff's legal services as described in Mr. Goldstein's request for guidance.

Now before the Court is Defendants' motion to dismiss Plaintiff's claims on the ground that the Court lacks subject matter jurisdiction or, alternatively, that Plaintiff's Amended Complaint fails to state a claim. The Court agrees that Plaintiff lacks standing and that this case is not yet ripe and therefore will grant Defendants' motion to dismiss.

## II.  FACTUAL & STATUTORY BACKGROUND

### A.  The AECA's Regulation of "Brokering Activities"

"In furtherance of world peace and the security and foreign policy of the United States," the AECA empowers the President to control the import and export of defense articles and services. *See* 22 U.S.C. § 2778(a)(1). Initially, the AECA only regulated the direct "manufacturing, exporting, or importing" of defense articles and services. *See* 22 U.S.C. § 2778 (1996 ed.); *see also* International Security Assistance and Arms Export Control Act of 1976,

Pub. L. No. 94–329, § 212(a)(1), 90 Stat. 729, 744–45.  In 1996, however, Congress amended

the AECA to require regulation of international arms brokering.  *See* Act of July 21, 1996, Pub.

L. No. 104–164, § 151, 110 Stat. 1421, 1437–38.  As the House Report explained, "the extension

of U.S. legal authority . . . to regulate [the] brokering activities" of "U.S. persons (and foreign

persons located in the U.S.)" would allow the United States to ensure that the activities of those

who broker in international arms "support the furtherance of U.S. foreign policy objectives,

national security interests and world peace."  H.R. Rep. No. 104-519, at 11–12 (1996), *reprinted*

*in* 1996 U.S.C.C.A.N. 1118, 1128–29.  "More specifically," the report noted that "in some

instances U.S. persons are involved in arms deals that are inconsistent with U.S. policy" and

"[c]ertain of these transactions could fuel regional instability, lend support to terrorism or run

counter to a U.S. policy decision not to sell arms to a specific country or area."  *Id.* at 12.

Accordingly, the AECA now requires "every person" who "engages in the business of

brokering activities with respect to the manufacture, export, import, or transfer" of a defense

article or service to both register with the government and procure a license to engage in such

brokering activities.  22 U.S.C. § 2778(b)(1)(A)(ii)(I)–(III).  The statute further provides that

entities must abide by requirements "[a]s prescribed in regulations issued under this section."  *Id.*

§ 2778(b)(1)(A)(ii)(I).  As part of its International Traffic in Arms Regulations ("ITAR"), State

has promulgated regulations specific to brokering activities at Title 22, Part 129 of the Federal

Code of Regulations ("Part 129"), *see generally* 22 C.F.R. §§ 129.1–129.11.[1]

---

[1] In 2013, the President delegated to State his authority under 22 U.S.C. § 2778 "for the
registration and licensing of those persons who engage in the business of brokering activities
with respect to defense articles or defense services."  *See* Exec. Order No. 13,637, 78 Fed. Reg.
16,129 (Mar. 8, 2013).  But State has regulated brokering activities through the ITAR ever since
Congress first amended the AECA in 1996.  *See, e.g.*, Bureau of Political-Military Affairs;
Amendments to the International Traffic in Arms Regulations, 62 Fed. Reg. 67,274, 67,275
(Dec. 24, 1997) (promulgating "new Part 129" to set forth "guidance concerning persons

Part 129 requires any person engaged in brokering activities to register with the Directorate of Defense Trade Controls ("the Directorate") as a "precondition for the issuance of approval for brokering activities" or for "the use of exemptions." 22 C.F.R. § 129.3(a); *see also id.* § 129.3(e). Once registered, a person may not "engage in the business of brokering activities . . . without first obtaining the approval of the Directorate of Defense Trade Controls for the brokering of" a number of regulatory-prescribed defense articles and services. *Id.* § 129.4(a); *see also id.* § 129.5 (listing exemptions from the approval requirement, not relevant here). To obtain approval, a broker must supply the Directorate with certain information and fully describe "the brokering activities that will be undertaken" including: "[t]he action to be taken by the applicant to facilitate the manufacture, export, import, or transfer" of the defense article; "[t]he name, nationality, address, and place of business of all persons who may participate in the brokering activities"; a description of the defense articles involved; the estimated quantity and dollar value; and the "[e]nd-user and end-use." *Id.* § 129.6(a)–(b). Part 129 also requires registrants to provide a report to the Directorate "on an annual basis" detailing the registrant's "brokering activities in the previous twelve months." *Id.* § 129.10(a). That report must include a description of the "brokering activities that received or were exempt from approval" or otherwise certify that "there were no such activities." *Id.* § 129.10(b)–(c). In addition, a "person who is required to register" as a broker "must maintain records concerning brokering activities," which "shall be available at all times for inspection and copying by the Directorate." *Id.* §§ 129.11, 122.5(b).

---

required to register as brokers and the types of brokering activities that require prior approval of the Department of State").

Until 2013, Part 129's definition of "broker" and "brokering activities" was quite general. A broker was defined as "any person who acts as an agent for others in negotiating or arranging contracts, purchases, sales or transfers of defense articles or defense services in return for a fee, commission, or other consideration." 22 C.F.R. 129.2(a) (2006 ed.); *see also* Bureau of Political-Military Affairs; Amendments to the International Traffic in Arms Regulations, 62 Fed. Reg. 67,274, 67,276–77 (Dec. 24, 1997) (first adding Part 129 in light of the AECA amendment regulating brokering activities). And "brokering activities" were defined as "acting as a broker as defined in § 129.2(a)," including "the financing, transportation, freight forwarding, or taking of any other action that facilitates the manufacture, export, or import of a defense article or defense service, irrespective of its origin." 22 C.F.R. § 129.2(b) (2006 ed.).

In 2011, in light of a 2003 report to Congress in which State had "noted that it was beginning a review of the brokering regulations" and "assess[ing] the need to modify the regulations in light of the experience gained in administering them," State issued a Notice of Proposed Rulemaking that substantially altered the regulatory definition of "broker" and "brokering activities." Amendment to the International Traffic in Arms Regulations: Registration and Licensing of Brokers, Brokering Activities, and Related Provisions, 76 Fed. Reg. 78,578, 78,578 (Dec. 19, 2011). As pertinent to this case, State proposed to amend the definition of brokering activities to clarify that "[b]rokering activities do not include . . . activities by an attorney that do not extend beyond providing legal advice to a broker." *Id.* at 78,587 (proposed language for § 129.2(e)(3)); *see also id.* at 78,578 (explaining change).

State promulgated an Interim Final Rule in 2013, amending Part 129. *See generally* Amendment to the International Traffic in Arms Regulations: Registration and Licensing of Brokers, Brokering Activities, and Related Provisions, 78 Fed. Reg. 52,680 (Aug. 26, 2013). In

response to the comments of three parties, State altered the proposed language of § 129.3 slightly to clarify that the definition of brokering activities does not extend beyond the provision of legal advice to a *client* (rather than to a *broker*). *Id.* at 52,681. Thus, the current definition, effective October 24, 2013, provides that "brokering activities" do not include "activities by an attorney that do not extend beyond the provision of legal advice to clients." 22 C.F.R. § 129.2(b)(2)(iv).[2]

In a "Frequently Asked Questions" section of its website, the Directorate provides further guidance regarding the regulatory definition's scope. The FAQs state that:

> Activities conducted by an attorney, consultant, or any other professional that do not extend beyond the provision of legal or consulting advice to clients on ITAR compliance is not within the definition of brokering activities. For example, advising on the legality of a transaction, such as advising whether a transaction is ITAR compliant, tax rates or other laws may be preferential, drafting of contract terms where parties to the transaction have already been identified by the client, representing your client to a client-identified foreign party, conducting ITAR audits, and/or providing training or assistance with ITAR compliance procedures, are outside the scope of brokering activities. However, this does not mean that there are no circumstances where an attorney, consultant, or any other professional would be a broker. If these persons engage in activities that go beyond providing consulting or legal advice, including being a third party to the transaction, or are engaged in soliciting, locating a buyer or seller, introducing or recommending specific parties, structuring the transaction, marketing, promoting, and/or negotiating ITAR-controlled defense articles and services on behalf of their clients beyond contract terms of already identified foreign parties by your client, then such activities may constitute brokering activities under ITAR Part 129.2(b).

*Frequently Asked Questions (FAQs) – Registration*, U.S. Dep't of State, Directorate of Defense Trade Controls (July 2, 2015), http://pmddtc.state.gov/registration/faqs_reg.html.

---

[2] Plaintiff's complaint alleges that this amendment is an "expansion" of Part 129 because, in its understanding, "Part 129 was not applied to legal services by attorneys" before 2013. Am. Compl. ¶ 27. In the Court's view, Plaintiff's interpretation gets it exactly backwards. As far as the regulatory history reveals, the regulation's language remained open-ended until State *clarified* in 2013 that legal services were not generally included in the definition of "brokering activities." If anything, the amendment appears to have narrowed what one might otherwise have previously interpreted to be the regulation's reach.

## B.  Guidance Available From the Department of State

Because this dispute was caught in the cross-hairs of the 2013 change in legal regime, the

Court also briefly describes the available methods for seeking guidance from State about the

ITAR's requirements.

Before the 2013 amendments, 22 C.F.R. § 129.10, entitled "Guidance," provided that

"[a]ny person desiring guidance on issues related to" Part 129, "such as whether an activity is a

brokering activity within the scope of this Part . . . may seek guidance in writing from the

Directorate of Defense Trade Controls."  22 C.F.R. § 129.10 (2006 ed.).  The provision cross-

referenced to "[t]he procedures and conditions stated in § 126.9."  *Id.*  Section 126.9, in turn,

provides a mechanism to request advisory opinions that "are issued on a case-by-case basis and

apply only to the particular matters presented to the Directorate of Defense Trade Controls."  22

C.F.R. § 126.9(a).  Any request for an advisory opinion "must be made in writing" and "must

outline in detail the equipment, its usage, the security classification (if any) of the articles or

related technical data, and the country or countries involved."  *Id.*  The section further cautions

that advisory opinions "are not binding on the Department of State, and may not be used in

future matters before the Department."  *Id.*

The 2013 Interim Final Rule revised, renumbered, and substantially altered the guidance

available to regulated entities under Part 129.  Previous § 129.10 was renumbered as § 129.9.

Section 129.9 now provides a stand-alone method by which a party can seek guidance.  The

section still provides that a person "desiring guidance on whether an activity constitutes a

brokering activity within the scope of this part 129 may request in writing guidance from the

Directorate of Defense Trade Controls."  22 C.F.R. § 129.9.  But the new section goes on to

require that the requester "identify the applicant and registrant code (if applicable) and describe

fully the activities that will be undertaken," listing specific information that a requester must

provide—including the "name, nationality, and geographic location of all U.S. and foreign

persons who may participate in the activities," the "[e]nd-user and end-use," and "[a] copy of

any agreement or documentation, if available, between or among the requester and other persons

who will be involved in the activity or related transactions that describes the activity to be taken

by such persons"—that go far beyond the more limited information required by § 126.9. *Id.*;

*compare* 22 C.F.R. § 126.9. There appears to be a benefit to that specificity, however:

§ 129.9(b) states that any guidance received as a result of a request "will constitute an official

determination by the Department of State." *Id.*[3]

### C.  Factual Background

Plaintiff's law practice focuses on international trade. *See* Am. Compl. ¶ 63. As alleged

in its complaint, Plaintiff's clients "include exporters of military, homeland security, dual-use,

and purely commercial items and technologies," and Plaintiff advises its clients "on all aspects of

U.S. export control laws and related international trade laws." *Id.* Plaintiff contends that "[m]ost

of these legal services involve advisements on transactions subject to the ITAR." *Id.*

Concerned about the scope of the 2013 Final Interim Rule, Plaintiff's principal, Matthew

A. Goldstein, sought an advisory opinion from Daniel Cook, the Directorate's Chief of the

Compliance, Registration, and Enforcement Division. Am. Compl. ¶ 37. While Plaintiff's

complaint alleges that the request was sent pursuant to 22 C.F.R. § 129.9(a), *see* Am. Compl. ¶

37, Plaintiff has since clarified that Mr. Goldstein's request was submitted under the prior

---

[3] Defendants contend that regulated entities retain the option of seeking a non-binding advisory opinion under § 126.9. *See* Defs.' Mem. Supp. Mot. to Dismiss ("Defs.' Mem. Supp.") at 5, ECF No. 25-1. That provision remains in effect and is codified in Part 126, entitled "General Policies and Provisions."

guidance provision, 22 C.F.R. § 129.10, *see* Pl.'s Mem. Opp'n Defs.' Mot. to Dismiss at 7 n.2 ("Pl.'s Mem. Opp'n"), ECF No. 26-1.  Mr. Goldstein sent Mr. Cook a letter on August 29, 2013, three days after the Final Interim Rule was promulgated, but before its October 24, 2013 effective date, expressing concern that some lawyers' activities might fall within the regulatory definition of "brokering activities" because "export compliance advice frequently includes advice on how to structure transactions involving sales of defense articles and assistance in the preparation of contracts and other documents for such transactions."  Goldstein Aff. Attach. A ("Pl.'s Attach. A"), ECF No. 26-2 (reproducing letter); *see also* Am. Compl. ¶ 37.  The letter requested Mr. Cook's advice on whether six listed legal services would be considered as "brokering activities," as follows:

1) Advising how to structure transactions involving the sale of defense articles and defense services, to include advising how to structure sales, mergers, acquisitions, and divestitures that involve the transfer of defense articles and defense services;

2) Preparing contracts for the sale of defense articles and defense services, to include clauses, parts, and other provisions to contracts, as well as letters of intent, nondisclosure, and other documents incidental to contracts for sale, mergers, acquisitions, and divestitures;

3) Advising on and preparing technical assistance agreements and other Part 124 agreements, to include advising on how to structure the involvement of subcontractors, sub-licensees, and other parties to Part 124 agreements;

4) Advising on the availability of financing for export sales of defense articles and defense services, and preparation of legal documents required by financial institutions for financing of export sales of defense articles and defense services;

5) Advising on proposals to broker and sell defense articles and defense services and preparing proposals and clauses, parts, and other provisions to proposals; and

6) Corresponding and meeting with U.S. government personnel regarding licensing policy and specific requests to export defense articles and defense services.

Pl.'s Attach. A; *see also* Am. Compl. ¶ 37.  The letter further stated that Mr. Goldstein's services are not provided "on a commission or contingency basis" but "are performed for an hourly or flat fee," that the listed services "involve defense articles, technical data, and/or defense services described under ITAR Part 121, to include classified and unclassified defense articles and technical data," and that the listed services may "involve exports and services provided to any country except as limited by ITAR section 126.1" (which specifies countries with which brokering activities are banned or curtailed on various grounds).  Pl.'s Attach. A; *see also* Am. Compl. ¶ 38.

For over a year, State failed to respond to this request.  *See* Am. Compl. ¶ 39.  Plaintiff alleges that it "made repeated requests for information on [the] status of the Advisory Opinion Request."  *Id.*  In the interim, Mr. Goldstein sought an advisory opinion from the District of Columbia Bar Legal Ethics Committee regarding whether, to the extent his activities did constitute "brokering activities," he was permitted to comply with the ITAR's disclosure requirements without violating District of Columbia Rule of Professional Conduct 1.6 (presumably for obtaining prior approval for any transactions, *see* 22 C.F.R. § 129.6(a)–(b), or for purposes of submitting the necessary year-end report, *see id.* § 129.10(a)–(c)).  *See* Am. Compl. ¶ 56.[4]

Steuart Thomsen, Chair of the D.C. Bar Legal Ethics Committee, responded by two letters dated May 30, 2014, and June 25, 2014.  *See* Pl.'s Mem. Opp'n Ex. 4 ("Pl.'s Ex. 4"), ECF

---

[4] In pertinent part, Rule 1.6 provides that a lawyer "shall not knowingly . . . reveal a confidence or secret of the lawyer's client."  D.C. Rules of Prof'l Conduct R. 1.6(a)(1).  Among other circumstances, however, Rule 1.6(e) provides that a lawyer may reveal "client confidences or secrets" "with the informed consent of the client" or "when . . . required by law or court order."  *Id.* R. 1.6(e)(1), (2)(A).

No. 26-3; Pl.'s Mem. Opp'n Ex. 5 ("Pl.'s Ex. 5"), ECF No. 26-3.[5]  Those letters noted that "the issues [Mr. Goldstein] ha[d] identified are largely beyond the scope of the Legal Ethics Committee's authority to address."  Pl.'s Ex. 4 at 2; Pl.'s Ex. 5. at 2.  Nevertheless, Mr. Thomsen advised that "[t]urning over information required to be disclosed by law is not inconsistent with Rule 1.6, which provides an exception for such situations."  Pl.'s Ex. 4 at 2; Pl.'s Ex. 5 at 2.  To the extent Mr. Goldstein's clients object to those disclosures, Mr. Thomsen further advised that Mr. Goldstein should use "all legally permissible mechanisms for avoiding disclosure" or, to the extent he is aware of the law and its potential reach "prior to obtaining client secrets and confidences," he should "refrain from obtaining sensitive client information until [he] ha[s] communicated the risk of disclosure" to those clients."  Pl.'s Ex. 4 at 2; Pl.'s Ex. 5 at 2.  In circumstances, like "the instance case," where an attorney would be "aware prior to taking on the engagement that he or she will be required to disclose certain confidences and secrets," Mr. Thomsen explained that an attorney like Mr. Goldstein "must advise the client of these risks at the outset of the representation and obtain the client's informed consent prior to receiving any information subject to disclosure."  Pl.'s Ex. 5 at 4 (footnote omitted).

Mr. Thomsen acknowledged that, whether it would be possible to communicate "sufficient information to obtain a client's informed consent when the law requires the attorney to obtain approval . . . prior to engaging in such communications is a determination that must be

---

[5] Those letters state that the Directorate "recently announced it is now applying Part 129 to a variety of legal services routinely provided by attorneys, which it considers as falling within the definition of brokering activities."  Pl.'s Ex. 4 at 2; Pl.'s Ex. 5 at 2.  The letter does not identify a source for that contention, which seems to conflict in some respects with the regulation itself.  It appears that the contention was supplied by Mr. Goldstein, as the letter reports that Mr. Thomsen "ha[d] not undertaken any independent review of the ITAR" but simply relied on how Mr. Goldstein had "described the ITAR . . . for purposes of [his] inquiry."  Pl.'s Ex. 4 at 2 & n.2; Pl.'s Ex. 5 at 2 & n.2.

left to the attorney's professional judgment and discretion." *Id.*  Ultimately, Mr. Thomsen

advised that "[t]o the extent that you are required by law to reveal certain information that would

otherwise be subject to the protections of Rule 1.6 *prior to engaging in substantive*

*communications with your client*, you may find that it is impossible to comply with the informed

consent provision found in 1.6(e)(1)." *Id.* at 2 (emphasis added).[6]

On July 3, 2014, Mr. Goldstein finally received some type of communication from State.

On that date, Mr. Cook called Mr. Goldstein to discuss Mr. Goldstein's advisory opinion request.

Plaintiff alleges that the two discussed the request "at length" and Mr. Cook advised Mr.

Goldstein that, "so long as no fee arrangements are [made] on a commission or contingency

basis," the "legal services described in Plaintiff's Advisory Opinion Request are not subject to

Part 129."  Am. Compl. ¶ 40.  Thereafter, Mr. Goldstein sent Mr. Cook a follow up letter

officially withdrawing his advisory opinion request, and reiterating the substance of Mr. Cook's

guidance.  *See* Am. Compl. ¶ 42; *see also* Goldstein Aff. Attach. C, ECF No. 26-2.   In the

ensuing months, Plaintiff alleges that it "corresponded with attorneys and public interest groups

and notified them of the advisement provided by Defendant Cook," and "relying on the

advisement provided by Defendant Cook . . . provided legal services described in the Advisory

Opinion Request."  Am. Compl. ¶¶ 43, 44.

---

[6] Although the two letters from the D.C. Bar are nearly identical, there are small but not unimportant differences.  For example, the first letter from the D.C. Bar, dated May 30, 2014, opined only that "[w]hether it is practically possible to adequately communicate and evaluate risks in a situation in which any information transmitted to you is subject to disclosure is something only you can determine in discussion with your client."  Pl.'s Ex. 4 at 2.  It was only in the D.C. Bar's second letter, dated June 25, 2014, that a sentence was added regarding the potential "impossibility" of complying with Rule 1.6(e)(1).  *Compare* Pl.'s Ex. 5 at 2, *with* Pl.'s Ex. 4 at 2.  Pages four and five of the second letter also contain minor alterations, which do not appear to substantively change the scope of Mr. Thomsen's advice.  *See* Pl.'s Ex. 5 at 4–5. Plaintiff has not explained why a second letter, identifying the same May 1, 2014 request Mr. Goldstein had submitted but making substantive changes to the D.C. Bar's opinion, was issued.

On February 24, 2015, seven months after he had spoken with Mr. Goldstein, Plaintiff alleges that Mr. Cook sent Mr. Goldstein a letter advising him that his advisory opinion request, and his conversation with Mr. Cook, "lacked sufficient detail for the Department to make an official determination as to whether the activities discussed constituted brokering activities." Am. Compl. ¶ 46; *see* Decl. of Daniel L. Cook ("Cook Decl.") Attach. B at 1, ECF No. 25-2.[7] The letter encouraged Mr. Goldstein to review State's Frequently Asked Questions for guidance and invited Mr. Goldstein to "submit a written request" under the newly-promulgated section 129.9 should he have "further questions regarding whether a specific activity falls under the provisions of ITAR Part 129." Cook Decl. Attach. B at 1–2. Mr. Cook further cautioned that "the information provided in this letter should be construed as general guidance, not an official Department position under ITAR Section 129.9, as official guidance under 129.9 must be case-specific." *Id.* at 2. Plaintiff characterizes this letter as a withdrawal of the advice Mr. Cook had previously provided by telephone. *See* Am. Compl. ¶ 45.

Soon thereafter, on March 3, 2015, Plaintiff filed suit in this Court. *See* Compl., ECF No. 1. Its complaint alleges that Defendants' "application of Part 129 to legal services requires Plaintiff and other attorneys who may provide such services to register with the Department of State as arms brokers, to disclose confidential client information, and to provide law enforcement agents with open access to law firm records without a subpoena, warrant or other legal process subject to judicial review." Am. Compl. ¶ 3. The complaint seeks recovery on five claims: (1) that Defendants should be equitably estopped from applying Part 129 to Plaintiff's activities

---

[7] Plaintiff alleges that the letter was sent on February 24, 2015, despite the fact that the letter itself is dated February 6, 2015. *Compare* Am. Compl. ¶ 45, *with* Cook. Decl. Attach. B at 1. Plaintiff does not further explain this discrepancy, or the basis for its allegation that the letter was sent weeks after it was dated.

because of Plaintiff's reasonable reliance on the advice Mr. Cook relayed by telephone; (2) that

Part 129's definition of "brokering activities," specifically its description of which legal services

are subject to the ITAR, is unconstitutionally vague in violation of the Fifth Amendment's Due

Process Cause; (3) that Defendants' application of Part 129 to legal services is *ultra vires* and

exceeds authority under the AECA; (4) that application of Part 129 violates the "separation of

powers"[8] under the Tenth Amendment; and (5) that Defendants' application of Part 129 to any

legal services violates the Administrative Procedure Act ("APA").  *See* Am. Compl. ¶¶ 68–114.

Plaintiff seeks both declaratory and permanent injunctive relief.  *See* Am. Compl. at 22–23.

After Plaintiff filed its complaint, Mr. Cook sent Mr. Goldstein yet another letter, dated

May 15, 2015, stylized as a "supplemental advisory opinion" to "provide additional guidance"

and "describe[] activities by an attorney that would constitute provision of legal advice to a client

and not brokering activity."  Cook Decl. Attach. C at 1, ECF No. 25-2.  Mr. Cook noted that the

Directorate "does not intend for registration to be a prerequisite for providing legal services in

connection with the types of activities referenced in your letter."  *Id.* at 2.  That letter advised Mr.

Goldstein that four of the activities identified in his advisory opinion request—those enumerated

as numbers one (advising clients how to structure transactions), two (preparing contracts), three

(advising clients on and preparing technical assistance agreements), and five (advising on

proposals to broker and sell defense articles)—"would constitute the provision of legal advice,"

and thus would not "fall within the scope of brokering activities," so long as the client has

"already identified the foreign party/parties."  *Id.* at 2.  With respect to the fourth type of service,

---

[8] As Defendants point out, because this claim is premised on the Tenth Amendment and
the State Department's alleged intrusion on the states' traditional authority to regulate the legal
profession, the claim is in fact premised on federalism principles, despite the "separation of
powers" label.  *See* Defs.' Mem. Supp. at 30 n.8.

advising clients on the availability of financing for defense articles and preparing legal documents required to finance those export sales, Mr. Cook advised that "as long as you provide a listing from open sources of potential financial institutions for selection by your client," this service would not constitute a brokering activity.  *Id.* at 2–3.  Finally, with respect to the sixth listed activity—corresponding and meeting with U.S. government personnel—Mr. Cook advised that the activity is not within the scope of "brokering activities."  *Id.* at 3.  The letter also advised Mr. Goldstein that the activities described "would not be the subject of an ITAR enforcement action against you if you engaged in these activities since August 6, 2014," and reiterated that Mr. Goldstein could seek official guidance with respect to "any specific proposed activity" by submitting a request under 22 C.F.R. § 129.9(a).  *Id.* at 1, 3.

Defendants have now moved to dismiss Plaintiff's claims under Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6), arguing that this Court lacks subject matter jurisdiction and that, even if jurisdiction is proper, Plaintiff's Amended Complaint fails to state a claim.  *See* Defs.' Mem. Supp. Mot. to Dismiss ("Defs.' Mem. Supp.") at 10–36, ECF No. 25-1.  Plaintiff opposes dismissal on all grounds.  *See* Pl.'s Mem. Opp'n at 12–38.

### III.  LEGAL STANDARD

Federal courts are courts of limited jurisdiction, and the law presumes that "a cause lies outside this limited jurisdiction . . . ." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *see also Gen. Motors Corp. v. EPA*, 363 F.3d 442, 448 (D.C. Cir. 2004) ("As a court of limited jurisdiction, we begin, and end, with an examination of our jurisdiction.").  It is the plaintiff's burden to establish that the court has subject matter jurisdiction.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

Because subject matter jurisdiction focuses on the Court's power to hear a claim, the Court must give the plaintiff's factual allegations closer scrutiny than would be required for a 12(b)(6) motion for failure to state a claim. *See Grand Lodge of Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13–14 (D.D.C. 2001). Thus, the Court is not limited to the allegations contained in the complaint. *See Wilderness Soc'y v. Griles*, 824 F.2d 4, 16 n.10 (D.C. Cir. 1987). Instead, "where necessary, the court may consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992) (citing *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir.1981)).

The D.C. Circuit has explained that a motion to dismiss for lack of standing constitutes a motion under Rule 12(b)(1) of the Federal Rules of Civil Procedure because "the defect of standing is a defect in subject matter jurisdiction." *Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987). Likewise, motions to dismiss on the grounds of ripeness and mootness have consistently been brought under Rule 12(b)(1), because those justiciability concerns typically implicate the court's subject-matter jurisdiction. *See, e.g.*, *Del Monte Fresh Produce Co. v. United States*, 570 F.3d 316, 321, 326 (D.C. Cir. 2009) (reviewing dismissal under 12(b)(1) on mootness grounds); *Venetian Casino Resort, L.L.C. v. EEOC*, 409 F.3d 359, 363, 366 (D.C. Cir. 2005) (reviewing dismissal under 12(b)(1) on ripeness grounds); *see also Larsen v. U.S. Navy*, 525 F.3d 1, 4 (D.C. Cir. 2008) ("'Federal courts lack jurisdiction to decide moot cases because their constitutional authority extends only to actual cases or controversies.'" (quoting *Iron Arrow Honor Soc'y v. Heckler*, 464 U.S. 67, 70 (1983))); *Exxon Mobile Corp. v. FERC*, 501 F.3d 204,

208 (D.C. Cir. 2007) (noting that "[t]he question of ripeness goes to our subject matter jurisdiction" (quoting *Duke City Lumber Co. v. Butz*, 539 F.2d 220, 221 n.2 (D.C. Cir. 1976))).[9]

## IV. ANALYSIS

In support of their motion to dismiss, Defendants argue that this Court is without jurisdiction over this dispute because Plaintiff has not established an injury in fact sufficient to confer standing and because Plaintiff's claims are not yet ripe, or have now become moot. From the outset the Court notes that three aspects of this case are particularly informative to its analysis: the broad, generalized nature of Mr. Goldstein's request for an advisory opinion from State, devoid of any specific detail describing Plaintiff's proposed activities; the hypothetical and inherently tentative nature of State's response to that request; and Plaintiff's vague, generalized

---

[9] To be sure, not every justiciability concern is one of subject matter jurisdiction. Indeed, the D.C. Circuit recently clarified that certain justiciability questions are governed by Rule 12(b)(6), rather than Rule 12(b)(1), while at the same time acknowledging that it "'ha[s] not always been consistent in maintaining'" the "distinction between a claim that is not justiciable . . . and a claim over which the court lacks subject matter jurisdiction." *Sierra Club v. Jackson*, 648 F.3d 848, 853 (D.C. Cir. 2011) (alteration in original) (quoting *Oryszak v. Sullivan*, 576 F.3d 522, 527 (D.C. Cir. 2009)) (holding that a motion to dismiss claiming that a decision is committed wholly to an agency's discretion, and "therefore not justiciable," is governed by Rule 12(b)(6)). Accordingly, although the D.C. Circuit does not appear to have directly addressed the issue, it is possible that a motion to dismiss a prudentially, but not constitutionally, unripe claim is properly brought under Rule 12(b)(6), rather than Rule 12(b)(1) because where "prudential considerations . . . innervate the ripeness doctrine," courts "'dismiss[] even if there is not a constitutional bar to the exercise of [its] jurisdiction.'" *Full Value Advisors, LLC v. SEC*, 633 F.3d 1101, 1106 (D.C. Cir. 2011) (first alteration in original) (quoting *Wyo. Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 48 (D.C. Cir. 1999)); *see Horne v. Dep't of Agric.*, 133 S. Ct. 2053, 2062 (2013) (explaining that "prudential ripeness" considerations "[are] not, strictly speaking, jurisdictional" (internal quotation marks and citation omitted)). But "even in a case raising only prudential concerns, the question of ripeness may be considered" as a threshold issue "on a court's own motion." *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003). Therefore, regardless of whether Rule 12(b)(1) or Rule 12(b)(6) applies, the Court would still conclude that Plaintiff's claims are not prudentially ripe for the same reasons as explained below. *Cf. Sierra Club*, 648 F.3d at 854 ("[I]f the district court was correct in dismissing the action as a nonjusticiable challenge . . . it is within our power to affirm despite the citation of the wrong rule.").

assertion, unaccompanied by specific factual allegations, that Plaintiff will be *required* to disclose confidential client information if it is subjected to Part 129's requirements. The requirement that a plaintiff show standing, like other justiciability concerns, "assures that there is a real need to exercise the power of judicial review in order to protect the interests of the complaining party" and "requires federal courts to satisfy themselves that the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant *his* invocation of federal-court jurisdiction." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) (emphasis in original) (internal quotation marks and citations omitted). Ultimately, Plaintiff has failed to do so here. Because Plaintiff has not demonstrated an injury in fact and because, in any event, its claims are not yet ripe, the Court will grant Defendants' motion to dismiss.[10]

### A. Plaintiff Fails to Demonstrate an Injury in Fact

Article III limits federal courts' jurisdiction to particular "cases" and "controversies" and the Supreme Court has consistently explained that "[n]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal court jurisdiction to actual cases or controversies." *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1146 (2013) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006)). "The

---

[10] The Court thus need not consider the merits of Plaintiff's claims. The Court also notes that it finds Defendants' contention that Mr. Cook's May 15, 2015 letter mooted Mr. Goldstein's claims unpersuasive. That letter stated that Plaintiff "would not be the subject of an ITAR enforcement action . . . if [Mr. Goldstein] engaged in [the listed] activities since August 6, 2014." Cook Decl. Attach. C at 1. But in explaining that Part 129's "brokering activities" definition would not apply to legal services where an attorney's "client has already identified the foreign party/parties" to the transaction, *id.* at 2, the letter implicitly left open the possibility of enforcement where the foreign parties remain unidentified. Although the Court concludes below that Plaintiff has not sufficiently alleged an injury in fact based on activities of that sort, and any such claim is nevertheless unripe, to the extent those strictures had been satisfied the possibility of enforcement left open by the May 15 letter would preclude Plaintiff's claims from becoming moot.

'irreducible constitutional minimum' for standing is (i) the party must have suffered a concrete and particularized injury in fact, (ii) that was caused by or is fairly traceable to the actions of the defendant, and (iii) is capable of resolution and likely to be redressed by judicial decision." *Sierra Club v. EPA*, 755 F.3d 968, 973 (D.C. Cir. 2014).   In other words, to establish standing as a constitutional matter a plaintiff must "demonstrate the existence of a 'personal injury fairly traceable to the opposing party's allegedly unlawful conduct and likely to be redressed by the requested relief." *Delta Air Lines, Inc. v. Exp.-Imp. Bank of U.S.*, 85 F. Supp. 3d 250, 260 (D.D.C. 2015) (brackets omitted) (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)).   And, to show an injury in fact, a plaintiff must have suffered "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (internal quotation marks and citations omitted).

A plaintiff bears the burden of demonstrating its standing. *Id.* at 561.   When assessing standing at the motion to dismiss stage, the Court will "accept the well-pleaded factual allegations as true and draw all reasonable inferences from those allegations in the plaintiff's favor," but will "not assume the truth of legal conclusions, nor . . . accept inferences that are unsupported by the facts set out in the complaint." *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015) (internal quotation marks and citations omitted).   Mere assertions of injury, unsupported by factual allegations, will not do. *See Clapper*, 133 S. Ct. at 1154 (finding no standing where respondents "present no concrete evidence to substantiate their fears, but instead rest on mere conjecture about possible governmental actions").   If an allegation of injury is based on future conduct, the Supreme Court has "repeatedly reiterated that 'threatened injury must be *certainly impending* to constitute injury in fact,' and that 'allegations of *possible* future injury' are not

sufficient." *Id.* at 1147 (brackets omitted) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)). While "imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes." *Id.* (quoting *Lujan*, 504 U.S. at 565 n.2).

In response to Defendants' motion to dismiss, Plaintiff claims that Part 129's application to legal services forces a head-on conflict between those regulations and the D.C. Rules of Professional Conduct. Plaintiff claims that it is injured by Part 129 because that Part's application to legal services "requires that attorneys disclose confidential client information." Pl.'s Mem. Opp'n at 16. As a result, Plaintiff contends that it will be forced "to choose between not providing the legal services and violating professional rules of responsibility or violating federal law." *Id.* at 20. Further, it argues that Part 129's application to Plaintiff's legal services violates its "constitutionally protected liberty interest in pursuing its profession." *Id.* at 15.

While the Court does not gainsay that an interest in pursuing one's profession is a cognizable liberty interest, "the injury in fact test requires more than an injury to a cognizable interest. It requires that the party seeking review be himself among the injured." *Lujan*, 504 U.S. at 563 (quoting *Sierra Club v. Morton*, 405 U.S. 727, 734–35 (1972)). For several reasons, Plaintiff fails to carry its burden to show that it is among the injured here.

First, Plaintiff's theory of injury relies entirely on a threshold showing that it has engaged in or will engage in some activity that might fall within the scope of "brokering activity." Only by showing that fact can Plaintiff claim that Part 129's requirements will be applied to its activities. To the extent Plaintiff does anything more than simply assume this to be the case, it relies primarily on Mr. Cook's letter, and its implicit acknowledgement that an attorney's advice to or services on behalf of a client where the foreign parties are unknown might fall within the

20

definition of "brokering activity."[11]   *See, e.g.*, Pl.'s Surreply at 2–3, ECF No. 30.   Yet, Plaintiff

has failed to concretely allege that it has, or will in the future, engage in any such activities.   Mr.

Goldstein's affidavit merely states that his firm "regularly represents clients" where the foreign

parties to prospective transactions "are often not identified by the client."   Goldstein Aff. ¶ 9.

Indeed, although Plaintiff claims it "provided legal services [as] described in the Advisory

Opinion Request" for a period of several months before Mr. Cook clarified his advice, Am.

Compl. ¶ 44, it is telling that Mr. Goldstein's affidavit nevertheless lacks *any* specific allegation

that Plaintiff did during that time, or definitively will in the future, advise clients in transactions

where the foreign parties remain unknown.   *See Human Soc'y of U.S. v. Babbitt*, 46 F.3d 93, 98

(D.C. Cir. 1995) (citing *Lujan* and finding standing theory insufficient where association's

member's affidavit "omits an allegation that the asserted injury to [that member] is 'imminent'").

Even charitably read, Mr. Goldstein's allegation that he "often" represents clients where the

prospective parties to the transaction are not identified by the client at most implies that Plaintiff

---

[11] Defendants contend that Part 129 makes clear that the definition of "brokering activity" does not "include legal advice or services."   Defs.' Mem. Supp. at 12.   To be sure, the terms of the regulation state that "activities by an attorney that do not extend beyond the provision of *legal advice* to clients" do not fall within the regulation's scope.   22 C.F.R. § 129.2(b)(2)(iv) (emphasis added).   Yet, without explanation, Defendants refer much more broadly to "legal services."   Moreover, the record does not seem to support Defendants' claim that only activities taken by a lawyer which "involve taking a role in the transaction beyond simply advising on the transaction" fall within the definition of "brokering activities."   Defs.' Mem. Supp. at 13. Indeed, Mr. Cook's letter indicates that the *same* activities might fall within or outside "brokering activities" depending on whether the other party to a client's transaction has been identified.   But it is not immediately clear to the Court why a client's failure to identify the particular foreign parties involved would transform "legal advice" into something else.   Perhaps Defendants mean only to note that a failure to identify other parties might indicate or pose a risk that an attorney is acting more like a broker and less like an attorney.   In any event, and semantics aside, the record does suggest that State might seek to regulate as "brokering activities" some services that lawyers periodically provide to their clients.   Ultimately, as explained above, this issue matters little because Plaintiff's allegations here do not suffice to show that it engages in such activities.

anticipates engaging in such representation at some indeterminate point in the future.  "Such 'some day' intentions—without any description of concrete plans, or indeed even any specification of when the some day will be—do not support a finding of the 'actual or imminent' injury that [the Supreme Court's] cases require."  *Lujan*, 504 U.S. at 564.

Second, even had Plaintiff adequately alleged it was engaged in such activities, it has shown nothing other than a speculative threat of enforcement.  Mr. Cook's letter echoes State's Frequently Asked Questions, which indicate that the agency *might* conclude that, in some circumstances, an attorneys' activities in assisting a client fall within the definition of "brokering activities."  *See Frequently Asked Questions (FAQs) – Registration*, U.S. Dep't of State, Directorate of Defense Trade Controls, http://pmddtc.state.gov/registration/faqs_reg.html (July 2, 2015) (stating, for example, that if an attorney is involved in various services "beyond contract terms of already identified foreign parties by your client, then such activities *may constitute brokering activities*" (emphasis added)).  As Defendants explain, whether a particular transaction crosses into "brokering activity" is an inherently fact-bound determination dependent on the nature of the transaction and the parties.  The limitation is intended to "avoid the possibility, for example, that an attorney providing these services would also engage in brokering activities by finding the foreign party to the transaction."[12]  Defs.' Reply at 5, ECF No. 29.  The government has gone to pains to emphasize that the definition of "brokering activities" explicitly excludes

---

[12] Presumably, in such circumstances an attorney's actions could extend beyond mere "legal advice" and include the "[s]oliciting, promoting, negotiating, contracting for, arranging, or otherwise assisting in the purchase, sale, transfer, loan, or lease of a defense article or defense service."  22 C.F.R. § 129.2(b)(1)(ii).  Although Defendants have not noted it, if a client has not yet identified the foreign party to a transaction at the time an attorney acts, an attorney's activities might also conflict, even inadvertently, with Congress's purpose to ensure that U.S. persons are not "involved in arms deals that are inconsistent with U.S. policy" or transactions that "lend support to terrorism or run counter to a U.S. policy decision not to sell arms to a specific country or area."  H.R. Rep. No. 104-519, at 12 (1996).

traditional "legal advice," and Plaintiff has been unable to point to a single instance in which the services provided by an attorney were subject to an enforcement action or criminal proceeding for violating Part 129.  *Cf. Clapper*, 133 S. Ct. at 1148 (finding plaintiffs' theory of standing "speculative" and "undermine[d]" where they "fail to offer any evidence that their communications have been monitored under" the challenged statute and "merely speculate and make assumptions about whether their communications with their foreign contacts will be acquired" under the statute).  Plaintiff contends that "the whole point of pre-enforcement suits is to give plaintiffs relief before they must choose between exposing themselves to liability or refraining from exercising constitutional rights."  Pls.' Mem. Opp'n at 21.  That undoubtedly is so.  But that purpose does not absolve Plaintiff of its burden to show that any threat of enforcement is imminent or otherwise inflicts injury upon it.[13]  *See Johnson v. District of Columbia*, 71 F. Supp. 3d 155, 162 (D.D.C. 2014) (finding standing wanting where there existed a "total lack of previous enforcement," the government "has never threatened [plaintiff] with prosecution," "the government has disavowed any intention to prosecute," and the government "does not believe such conduct is prohibited by the statute").

Third, even if Plaintiff could show that it was actually engaging in or has previously engaged in brokering activities and that State might initiate enforcement proceedings against it, Plaintiff has alleged nothing more than conjecture to substantiate its claim that it risks being injured by Part 129's requirements.  Plaintiff points out that, if it does engage in "brokering

---

[13] The Court also rejects Plaintiff's "concerns over a change in enforcement policy" which it bases on its contention that "Defendants have already retracted earlier guidance provided to Plaintiff."  Pls.' Mem. Opp'n at 21.  Plaintiff readily concedes that its advisory opinion request was submitted under the prior guidance provision, § 129.10, which provided for non-binding guidance.  *Id.* at 7 n.7; *see* 22 C.F.R. § 129.10 (2006 ed.); 22 C.F.R. § 126.9.  Mr. Cook's subsequent letter merely confirms that State was unable to make a final, binding decision about whether Plaintiff's activities would constitute "brokering activities."

activities," it would be required to seek advance approval to engage in brokering activities on behalf of its client, submit a yearly report to State about those activities, and maintain records available for State's inspection.  *See* Pl.'s Mem. Opp'n at 16.  And Plaintiff generally alleges that it "cannot reasonably comply with Part 129 disclosure and record access requirements" and Rule 1.6.  Am. Compl. ¶ 64.  But beyond its bald assertion that it will be *required* to disclose confidential attorney client information, Plaintiff has not even attempted to allege with any specificity what type of information it would be required to but cannot provide without violating Rule 1.6.  *Cf. R.J. Reynolds Tobacco Co. v. FDA*, -- F.3d ----, No. 14-5226, 2016 WL 191913, at *4 (D.C. Cir. Jan. 15, 2016) (finding purported injury resulting from several Tobacco Products Scientific Advisory Committee members' access to plaintiffs' confidential information insufficiently imminent to confer standing because "plaintiffs ha[d] not set forth by affidavit or other evidence specific facts suggesting that the challenged members have made or will make improper use of confidential information").

Several basic questions remain unanswered.  For example: What kind of information would Plaintiff have to produce to which it anticipates that the attorney-client privilege might attach?  Why would that information fall within the ambit of Rule 1.6?  And why would it be difficult for Plaintiff to provide some more generalized information that would both satisfy Part 129's disclosure requirements and shield confidential information?  Defendants point out that Part 129 only requires an individual to "provide detailed factual information about a prospective transaction, not privileged information."  Defs.' Mem. Supp. at 15; *cf. U.S. v. Legal Servs. of N.Y. City*, 249 F.3d 1077, 1081 (D.C. Cir. 2001) (explaining that "[c]ourts have consistently held that the general subject matters of clients' representations are not privileged . . . [n]or does the

general purpose of a client's representation necessarily divulge confidential professional communication" (citation omitted)).  Plaintiff has not responded to this argument in its briefing.

Moreover, Plaintiff fails entirely to explain why or how it would be unable to advise its client about the requirements of Part 129, and seek informed consent before obtaining from its clients or providing to State any confidential information that might be necessary to comply with those requirements.  *Cf.* Defs.' Reply at 7 (arguing that Plaintiff "ignores the option that it could inform a client of the requirements imposed by Part 129 and obtain the client's informed consent to seek guidance regarding whether a particular activity is a brokering activity").  Plaintiff cherry picks a single line from the D.C. Bar's opinion letter stating that "[t]o the extent that you are required by law to reveal certain information that would otherwise be subject to the protections of Rule 1.6 prior to engaging in substantive communications with your client, you may find that it is impossible to comply with the informed consent provision found in 1.6(e)(1)."  Pl.'s Ex. 5 at 2.  But that opinion letter *itself* appears to support the idea that where an attorney is "aware prior to taking on the engagement that he or she will be required to disclose certain confidences and secrets," he can "advise the client of these risks at the outset of the representation and obtain the client's informed consent prior to receiving any information subject to disclosure."  Pl.'s Ex. 5 at 4 (footnote omitted).  Without more specific allegations, Plaintiff's singular assertion that application of Part 129 will cause it injury is no more than conjecture.[14]

---

[14] Goldstein seems to imply that he is caught in a Catch-22, making informed consent impossible.  He claims, somewhat opaquely, that "the advice necessary to provide the client with adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct is itself subject to prior approval under 22 C.F.R. § 129.4" Pl.'s Mem. Opp'n at 17–18.  Yet, Goldstein fails to explain how this circular logic is necessarily so.

Ultimately, Plaintiff has failed to allege in any concrete way that it is engaging in activities that might constitute "brokering activities," that possible enforcement by State over those activities is imminent, and that, if Plaintiff must comply with Part 129, it will face actual injury to its ability to pursue its profession and will necessarily be required to disclose client confidences.[15]  Plaintiff's bald assertion that it will be unable to carry out its profession and comply with Part 129 "cannot replace the type of factual allegations necessary to transform a speculative chain of possibilities into a plausible allegation of concrete, actual injury in fact." *Campbell v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, No. 14-0892, 2015 WL 5449791, at *8 (D.D.C. Sept. 16, 2015).  Without such factual allegations, Plaintiff lacks standing.

### B.  Plaintiff's Claims are Not Ripe

These same infirmities counsel in favor of the Court's conclusion that, even if Plaintiff could establish standing, a second jurisdictional obstacle inevitably stands in Plaintiff's way: ripeness.  "The ripeness doctrine generally deals with when a federal court can or should decide a case." *Am. Petroleum Inst. v. EPA*, 683 F.3d 382, 386 (D.C. Cir. 2012).  "The ripeness doctrine is 'designed to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'" *Chlorine Institute, Inc. v. Fed. R.R. Admin*, 718 F.3d 922, 927 (D.C. Cir. 2013) (quoting *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807–08 (2003)).  While part of the ripeness analysis is "subsumed into the Article

---

[15] Plaintiff briefly alludes to potential "economic loss" from its "inability to serve clients in the representations at issue." Pl.'s Mem. Opp'n at 20–21.  But, yet again, Plaintiff's pleadings, affidavit, and memoranda are devoid of any concrete, non-speculative factual allegations showing that they have yet or will in the future lose business because of Part 129.

III requirement of standing . . . even if a case is 'constitutionally ripe,' . . . the prudential aspect

of ripeness may provide an independent basis for a court not to exercise its jurisdiction." *Delta*

*Air Lines*, 85 F. Supp. 3d at 269 (internal quotation marks and citation omitted).

Under the prudential ripeness doctrine, "courts apply a familiar two-pronged balancing

test: first, a court must evaluate the 'fitness of the issue for judicial decision'; and second, a court

must consider 'the hardship to the parties of withholding [its] consideration.'" *Id.* (quoting

*Abbott Labs v. Gardner*, 387 U.S. 136, 149 (1967)). "In assessing the fitness prong, courts

evaluate 'whether the agency action is final; whether the issue presented for decision is one of

law which requires no additional factual development; and whether further administrative action

is needed to clarify the agency's position.'" *Nat'l Mining Ass'n v. Jackson*, 768 F. Supp. 2d 34,

46 (D.D.C. 2011) (quoting *Action Alliance of Senior Citizens v. Heckler*, 789 F.2d 931, 940

(D.C. Cir. 1986)).

Plaintiff's claims are not yet fit for judicial review. A "regulation is not ordinarily

considered the type of agency action 'ripe' for judicial review under the APA until the scope of

the controversy has been reduced to more manageable proportions, and its factual components

fleshed out, by some concrete action applying the regulation to the claimant's situation in a

fashion that harms or threatens to harm him." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891

(1990). Here, Mr. Cook's letter providing guidance to Plaintiff was phrased tentatively,

indicated that an assessment of any potential "brokering activity" necessarily depends on case-

specific facts, and was not binding upon State. Courts consistently find guidance letters of this

sort non-final and not ripe for adjudication. *See Ctr. for Auto Safety v. Nat'l Highway Traffic*

*Safety Admin.*, 452 F.3d 798, 808–09 (D.C. Cir. 2006) (concluding that a "generic letter" from

the National Highway Safety Administration was non-final where it suggested that "*in general*"

certain limitations to automobile recalls might be permissible but remained "conditional" and "only general in its prescriptions"); *Reliable Auto. Sprinkler Co., Inc. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 734 (D.C. Cir. 2003) (concluding that a letter indicating that the agency would consider plaintiff's products a "consumer product" under the relevant statute was not final because the letter contained "no unequivocal statement of the agency's position on the meaning of 'consumer product'" and that "application of the statutory term . . . would clearly involve the resolution of factual issues and the creation of a record"); *Am. Fed'n of Gov't Empls., AFL-CIO v. O'Connor*, 747 F.2d 748, 756 (D.C. Cir. 1984) (finding advisory opinion of the Merit Systems Protection Board's Special Counsel not ripe where unions had only "solicited an assurance that their registration activities, broadly and briefly described" complied with the law, and where the Special Counsel had not confronted any "member with a prosecution threat").

Moreover, further factual development here "would 'significantly advance [the court's] ability to deal with the legal issues presented.'" *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 812 (2003) (quoting *Duke Power Co. v. Carolina Envtl. Study Grp., Inc.*, 438 U.S. 59, 82 (1978)). Mr. Goldstein's request for guidance was phrased in the most general way. As Defendants aptly point out, "[g]iven the complete lack of specific factual information about the proposed transactions . . . [the Directorate] could hardly be expected to provide a response that discussed whether a particular service is a brokering activity in every possible circumstance." Defs.' Reply at 5. Whether any particular activity an attorney engages in shades into "brokering activity" will presumably depend on the contours of the particular transaction or activity. And the Court would necessarily have to consider those factual questions to assess Mr. Goldstein's constitutional vagueness, federalism, and APA claims—all of which require some understanding of whether, and to what extent, State's definition of "brokering activities" will capture attorneys'

legal services.  Unmoored from a fleshed-out factual setting, the Court is hindered in its ability to assess Plaintiff's claims.  Thus, for "many of the same reasons that standing is absent, the Court finds that further factual development is necessary (or at the very least, desirable) here."  *Delta Air Lines*, 85 F. Supp. 3d at 270.

The Court shares Plaintiff's concern that some uncertainty persists in State's definition of "brokering activities."  Yet, Plaintiff is not without recourse.  If Plaintiff desires concrete guidance before it faces the threat of an enforcement action, nothing precludes it from seeking guidance—and a binding State Department determination—that its proposed activity does not constitute a "brokering activity" by submitting a more detailed request that provides as much information as Plaintiff is able to without disclosing confidential attorney-client information.[16] *See* 22 C.F.R. § 129.9(a).  Even the government acknowledges that, had Plaintiff submitted a request for binding guidance under § 129.9(a) and had been "dissatisfied with the result," an action challenging State's response "may have been ripe."  Defs.' Mem. Supp. at 19.  For now, however, Plaintiff has not shown that it is injured by Part 129's hypothetical application to the legal services it provides and, in any event, its claims are not ripe.

## V.  CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is **GRANTED**.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  January 26, 2016                                                  RUDOLPH CONTRERAS
                                                                          United States District Judge

---

[16] *Cf.* 22 C.F.R. § 129.9(b) (noting that "[i]f at the time of submission certain information is not yet available, this circumstance must be stated and explained" and the Directorate "will take the completeness of the information into account in providing guidance on whether the activities constitute brokering activities").